UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

MELODY D RICHARDSON,                    )
(Social Security No. XXX-XX-6604),      )
                                        )
                    Plaintiff,          )
                                        )
          v.                            )          2:06-cv-162-RLY-WGH
                                        )
MICHAEL J. ASTRUE, Commissioner         )
of  Social Security,[1]                 )
                                        )
                    Defendant.          )


**MEMORANDUM  DECISION AND ORDER**

**I.  Statement of the Case**

    Plaintiff, Melody D. Richardson, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to Disability Insurance

Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d);

20 C.F.R. § 404.1520(f).  The court has jurisdiction over this action pursuant to 42 U.S.C.

§ 405(g).

    Plaintiff applied for DIB on April 27, 2004, alleging disability since May 1, 2003.

(R. 70-72).  On January 28, 2005, the agency found that Plaintiff was disabled as of

November 1, 2004, but no sooner.  (R. 41-42).  This decision was upheld on

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue, in his official
capacity only, is substituted as the Defendant in this action.

reconsideration.  (R. 52-54).  Plaintiff appeared without representation at a hearing before

Administrative Law Judge Reinhardt Korte ("ALJ") on August 15, 2005.  (R. 282-93).

The hearing was continued and Plaintiff appeared again without representation on

February 9, 2006.  (R. 296-322). Also testifying in addition to Plaintiff were a vocational

expert ("VE") and two medical experts.  (R. 296).  On March 31, 2006, the ALJ issued an

opinion finding that Plaintiff was not disabled because she retained the residual functional

capacity ("RFC") to perform a significant number of jobs in the regional economy.  (R. 8-

23).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's

decision as the final decision of the Commissioner.  (R. 2-4).  20 C.F.R. §§ 404.955(a),

404.981.  Plaintiff then filed a Complaint on August 7, 2006, seeking judicial review of

the ALJ's decision.

## II.  Medical Evidence

Plaintiff was seen by John Tesser, M.D., at the Arizona Rheumatology Center on

August 22, 2003.  (R. 201-04, 255-58).  Dr. Tesser noted that Plaintiff had a 15-year

history of psoriasis with subsequent formation of painful stiff joints.  (R. 255).  Dr. Tesser

explained that Plaintiff's right side was primarily affected including her right shoulder,

knee, foot, hand and wrist.  (R. 255).  Dr. Tesser's assessment was psoriatic arthritis,

osteoarthritis of the knees, trochanteric bursitis, carpel tunnel syndrome and pes cavus,

bilateral feet.  (R. 203).

Plaintiff visited Oscar S. Gluck, M.D., at the Arizona Rheumatology Center on

September 17, 2003.  (R. 199-200).  Dr. Gluck's assessment was psoriatic arthritis that was well maintained, suspect left knee internal derangement, and probable carpel tunnel syndrome.  (R. 199-200).

Dr. Gluck saw Plaintiff at the Arizona Rheumatology Center on October 9, 2003. (R. 197-98).  Plaintiff was mainly complaining of bilateral knee discomfort.  (R. 197). Dr. Gluck noted that Plaintiff has had injections but they provide only minimal relief.  (R. 197).  Dr. Gluck recommended Synvisic injections for Plaintiff's knees and opined that her psoriatic arthritis was under control but that she suffered from carpel tunnel syndrome with an EMG scheduled.  (R. 197-98).

On November 6, 2003, Plaintiff was examined by Dr. Tessler at the Arizona Rheumatology Center.  (R. 195-96).  Plaintiff complained of knee pain and swelling, and she explained that her symptoms were worse upon climbing stairs or getting out of chairs; she also experienced discomfort with walking.  (R. 195).  Plaintiff demonstrated good range of motion in the upper extremities, her lower extremities demonstrated no bony changes in her knees, but there was crepitus with both active and passive range of motion. (R. 195).  Dr. Tessler noted that a October 10, 2003 MRI of Plaintiff's left knee demonstrated grade II-III chondromalacia of the retropatellar cartilage involving a small focus at the lateral articular facet associated with focal bone marrow edema of the patella, and small joint effusion, but was otherwise negative.  (R. 195).  Dr. Tessler also noted that Plaintiff's psoriatic arthritis was under control and that Plaintiff suffered from myofascial pain.  (R. 196).

3

Plaintiff underwent a course of treatment for her right shoulder from Robert Mileski, M.D., from December 10, 2003, through May 7, 2004.  (R.  263-69, 279-80).  Plaintiff initially underwent injections but ultimately chose surgery.  Dr. Mileski performed a shoulder arthroscopy with subacromial decompression.  (R. 264).  On May 7, 2004, several months after the surgery, Plaintiff had full range of motion, no pain, and strength was 4+/5.  (R. 263).

Plaintiff was seen on January 5, 2004, at the Arizona Rheumatology Center by Dr. Gluck.  (R. 193-94).  Dr. Gluck noted that Plaintiff continued to suffer from paresthesias in her right upper extremity due to an irritated nerve in her right rotator cuff and possibly her neck.  (R. 193).  Plaintiff's psoriatic arthritis was doing well.  (R. 193).  Dr. Gluck noted mild bony overgrowth changes in both knees, and reduced range of motion in the right shoulder.  (R. 193).  Dr. Gluck's findings included psoriatic arthritis that was well maintained, osteoarthritis of the hands and knees, and cervicalgia with radiculopathy.  (R. 193-94).

On January 16, 22, and 29, 2004, Plaintiff underwent injections of her knees for osteoarthritis at the Arizona Rheumatology Center.  (R. 190-92).  Plaintiff was seen by Dr. Tesser on February 5, 2004, for an injection in her left knee.  (R. 189).  On February 11, 2004, Plaintiff saw Dr. Tesser again and underwent steroid injections in both knees after a recent fall exacerbated her osteoarthritis.  (R. 187-88).

Plaintiff underwent an exam by Dr. Tesser on March 8, 2004.  (R. 185-86).  Dr. Tesser noted that Plaintiff moved well in the office but suffered from psoriatic lesions on

her right arm and thighs.  (R. 185).  Plaintiff had right shoulder soreness and had recently underwent a procedure where the distal portion of her clavical was removed.  (R. 185). Plaintiff had suffered from osteoarthritis in her knee and underwent injections which improved her condition.  (R. 185).  Plaintiff had good range of motion and good muscle strength in her upper and lower extremities.  (R. 185).  Dr. Tesser opined that Plaintiff suffered from psoriatic arthritis that was responding favorably to treatment, osteoarthritis of the knees, trochanteric bursitis, and carpel tunnel syndrome.  (R. 185-86).

Plaintiff visited Dr. Tesser again on May 6, 2004.  (R. 183-84).  Dr. Tesser observed moderately severe restricted range of motion in Plaintiff's shoulders, medial joint line tenderness and subpatellar crepitus in both knees, and focal tenderness in the right hip area.  (R. 183).  Dr. Tesser opined that Plaintiff suffered from right trochanteric bursitis, psoriatic arthritis that was controlled, and osteoarthritis of the knees.  (R. 183-84).

Dr. Mileski examined Plaintiff on May 17, 2004.  (R. 262).  Plaintiff presented with knee pain.  (R. 262).  Dr. Mileski found trace effusion in Plaintiff's right knee and pain with palpation in both her right and left knees.  (R. 262).  Dr. Mileski's impression was patellafemoral syndrome.  (R. 262).

Ronald Bitza, M.D., issued a report on June 22, 2004.  (R. 179-80).  Dr. Bitza noted that Plaintiff had been under his care since February 18, 2002.  (R. 179).  He reported a history of psoriatic arthritis and osteoarthritis of the knees.  (R. 179).  Dr. Bitza opined that Plaintiff could lift ten pounds frequently and 20 pounds occasionally, could

stand and/or walk for only two hours in an eight-hour workday, and did not use any assistive devices.  (R. 179).  He further opined that Plaintiff's ability to sit was unrestricted, she had no need to alternate between sitting and standing, she could climb, stoop, kneel, crouch and crawl occasionally, she could balance frequently, and she had the unlimited ability to reach, handle, finger, feel, see, hear, and speak.  (R. 179).  He noted that Plaintiff did have environmental limitations.  (R. 179).

On November 13, 2004, Plaintiff underwent a consultative exam by Rita Coram, M.D.  (R. 150-51).  Plaintiff's chief complaints were psoriatic arthritis and osteoarthritis.  (R. 150).  Plaintiff explained that she had previously lived in Arizona and was on Enbrel and Sulindac, but she could no longer afford them since she had moved.  (R. 150).  Plaintiff also stated that she could not afford insurance but was not poor enough for Medicare.  (R. 150).  Plaintiff also reported that she used a cane for an assistive device any time she could, but she tried to avoid it.  (R. 150).  Dr. Coram observed that Plaintiff's extremities were without clubbing, cyanosis or edema, her peripheral pulses were +3 and symmetric, there was no evidence of arterial insufficiency, but Plaintiff did suffer from severe and diffused psoriatic plaques.  (R. 151).

Dr. Coram also explained that Plaintiff limps to the right and is bothered by increases in speed without the use of a cane.  (R. 151).  Dr. Coram further explained that Plaintiff "has relative sustainability and stability of her gait, but it is obvious she is hurting."  (R. 151).  Plaintiff's attempts at tandem walking, squatting, walking on heel to toe, hopping, and rising from a squatting position generated pain and instability.  (R.

151).  Plaintiff also had hammertoes bilaterally, demonstrated peri spinal tenderness, had diffuse tenderness over ankles, knees, wrists, and hips, and her straight leg rasing was negative bilaterally.  (R. 151).  Dr. Coram opined that Plaintiff "is definitely in pain with a normal level of activity and would be unable to stand or walk for what is considered to be a normal amount in a day."  (R. 151).  Plaintiff also demonstrated substantially abnormal ranges of motion in her hips, shoulders, and lumbar spine.  (R. 152).  Dr. Coram's impression was that Plaintiff suffered from psoriatic arthritis and osteoarthritis and was hampered by an unfortunate financial situation which rendered her unable to get proper treatment and left her with excruciating and constant generalized arthritic pain that puts her in a moderate level of disability and pain.  (R. 151).   On October 11, 2004, Richard T. Karkut, Psy.D., performed a mental status exam on Plaintiff.  (R. 170-73).  Dr. Karkut diagnosed a dysthymic disorder and assessed a global assessment of functioning score of 65.  (R. 173).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and

decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this court

may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that

of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus,

even if reasonable minds could disagree about whether or not an individual was

"disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v.*

*Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that

she suffers from a "disability" as defined by the Act.  "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of a medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential

five step test the ALJ is to perform in order to determine whether a claimant is disabled.

*See* 20 C.F.R. § 404.1520.  The ALJ must consider whether the claimant:  (1) is presently

employed; (2) has a severe impairment or combination of impairments; (3) has an

impairment that meets or equals an impairment listed in the regulations as being so severe

as to preclude substantial gainful activity; (4) is unable to perform his past relevant work;

and (5) is unable to perform any other work existing in significant numbers in the national

economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only

8

after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through the date of the decision, and Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 14).  The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had six impairments that are classified as severe:  psoriatic arthritis, osteoarthritis of the knees, hip bursitis, carpel tunnel syndrome, cervical disc disease, and residuals from right shoulder arthroscopy with subacromial decompression.  (R. 14).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 15).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 21).  Consequently, the ALJ concluded that Plaintiff retained the following RFC:  (1) she could perform a limited range of light work; (2) lift and carry 20 pounds occasionally and ten pounds frequently; (3) stand and walk at least two hours in an eight-hour workday; (4) must be permitted a sit/stand option; (5) could climb, stoop, kneel, crouch and crawl occasionally; (6) could balance frequently; (7) and must avoid concentrated exposure to extreme heat, extreme cold, vibration, and workplace hazards like heights and machinery.  (R. 21).  The ALJ determined that Plaintiff could not perform her past work.  (R. 21).  The ALJ opined that Plaintiff retained the RFC for a

9

significant range of light work and that Plaintiff could perform a significant number of jobs in the regional economy.  (R. 22).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 23).

## VI.  Issues

The court concludes that Plaintiff has essentially raised three issues.  The issues are as follows:

1.      Whether the ALJ improperly concluded that Plaintiff did not meet a listing.

2.      Whether the ALJ's decision at step five was improper.

3.      Whether the ALJ's RFC assessment was improper.

**Issue 1:**      **Whether the ALJ improperly concluded that Plaintiff did not meet a listing.**

Plaintiff alleges that the ALJ failed to properly analyze her psoriatic arthritis under the listings.  An impairment is disabling if it meets or substantially equals a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Specifically important in this instance is listing 14.09 which provides, in part, as follows:

14.09 Inflammatory arthritis.  Documented as described in 14.00B6, with one of the following:

A.  History of joint pain, swelling, and tenderness, and signs on current physical examination of joint inflamation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively, as defined in 14.00B6b and 1.00B2b and B2c.; . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1.  14.00B6 describes inflammatory arthritis as:

6.  Inflammatory arthritis (14.09) includes a vast array of disorders that differ in cause, course, and outcome.  For example, inflammatory spondyloarthropathies include ankylosing spondylitis, Reiter's syndrome and other reactive arthropathies, *psoriatic arthropathy*, Behçet's disease, and Whipple's disease, as well as undifferentiated spondylitis. Inflammatory arthritis of peripheral joints likewise comprises many disorders, including rheumatoid arthritis, Sjogren's syndrome, psoriatic arthritis, crystal deposition disorders, and Lyme disease.  Clinically, inflammation of major joints may be the dominant problem causing difficulties with ambulation or fine and gross movements, or the arthritis may involve other joints or cause less restriction of ambulation or other movements but be complicated by extra-articular features that cumulatively result in serious functional deficit.  When persistent deformity without ongoing inflammation is the dominant feature of the impairment, it should be evaluated under 1.02, or, if there has been surgical reconstruction, 1.03.

*Id*. (emphasis added).  As noted in listing 14.09, the inability to ambulate effectively is defined in listing 1.00B2b which explains:

b.  What We Mean by Inability to Ambulate Effectively

(1)  Definition.  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2)  To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the

> inability to walk a block at a reasonable pace on rough or uneven
> surfaces, the inability to use standard public transportation, the
> inability to carry out routine ambulatory activities, such as
> shopping and banking, and the inability to climb a few steps at a
> reasonable pace with the use of a single hand rail.  The ability to
> walk independently about one's home without the use of assistive
> devices does not, in and of itself, constitute effective ambulation.

*Id.*

In this instance, the ALJ did not analyze whether Plaintiff could ambulate effectively.  The ALJ simply concluded that Plaintiff did not meet or substantially equal any of the listings.  (R. 15).  The ALJ explained that he based this finding on the testimony of Paul A. Schnieder, M.D.  (R. 15).  However, Dr. Schnieder's testimony at Plaintiff's hearing demonstrated a complete misunderstanding of the listings.  Dr. Schnieder testified that Plaintiff did not meet listing 1.00B2b because in order to meet that listing the Plaintiff would "have to walk with aid of a walker or two canes."  (R. 316).  As noted above, listing 1.00B2b includes additional criteria for meeting the listing that go well beyond Dr. Schnieder's understanding of the listing.  Listing 1.00B2b explicitly states that an individual is unable to ambulate effectively if she is unable "to walk a block at a reasonable pace on rough or uneven surfaces."  20 C.F.R. Part 404, Subpart P, Appendix 1.  Neither the ALJ's decision nor Dr. Schnieder's testimony explains whether or not Plaintiff can walk a block at a reasonable pace on rough or uneven surfaces.  In fact, Plaintiff's November consultative exam by Dr. Coram revealed that Plaintiff did need an assistive device, and it calls into question whether or not Plaintiff would be able to walk at a reasonable pace for a block on rough or uneven

surfaces.  (R. 150-51).  The ALJ had relied on the report of Dr. Bitza that was based on an

evaluation of Plaintiff that was at least six months before Dr. Coram's exam and

suggested that, at that time, Plaintiff did not use an assistive device.  (R. 179-80).

Because there is evidence in the record that suggests that Plaintiff could have met listing

1.00B2b, and because the ALJ's opinion relied on a flawed understanding of listing

1.00B2b, this case must be remanded to reexamine listing 1.00B2b.[2]

**Issue 2:        Whether the ALJ's decision at step five was improper.**

Plaintiff also found fault in the ALJ's step five finding that Plaintiff retained the

RFC to perform a substantial number of jobs in the regional economy.  The ALJ based

this conclusion on the testimony by the VE that, based on Plaintiff's RFC, there were

10,355 light unskilled cashier jobs, 2,980 light unskilled office clerk jobs, and 5,255 light

unskilled hand packer/packager jobs that Plaintiff could perform.  However, the court

notes that the VE was clearly basing these numbers on the <u>Dictionary of Occupational</u>

<u>Titles</u> ("DOT").  (R. 319).  And, there is no evidence in the record that indicates that the

VE's numbers had some other basis besides the DOT.  However, the DOT clearly

indicates that the hand packer or packager job is classified as a medium exertional level

and it also clearly indicates that the office clerk job is a skilled job.  *See* Dictionary of

---

[2]Remand is also warranted for a consideration of whether Plaintiff's condition at some point in time was the medical equivalent of this listing.  The court notes Drs. Dobson and Greco of the Indiana State Agency did find that Plaintiff met the equivalent of this listing.  (R. 142, 148).  A determination of *when* Plaintiff's condition may have deteriorated to a point of meeting or being the equivalent of the listed impairment is a most difficult question, but one which may need to be addressed on remand.

Occupational Titles at http://www.occupationalinfo.org.  Plaintiff's RFC for light

unskilled work does not appear to coincide with either of these jobs, yet there was no

discussion by the VE as to why his testimony differed from information in the DOT.

Additionally, the VE's finding that Plaintiff could perform 10,355 unskilled light cashier

jobs is suspect.  The VE makes no mention of SSR 83-12 which deals with a sit/stand

option.  That particular Ruling of the Social Security Administration explains that an

individual who needs a sit/stand option "is not functionally capable of doing . . . the

prolonged standing or walking contemplated for most light work."  SSR 83-12.  It further

provides that "[u]nskilled types of jobs are particularly structured so that a person cannot

ordinarily sit or stand at will."  *Id*.  Despite these findings by the Social Security

Administration, the VE, without any explanation, found that Plaintiff could perform a

substantial number of cashier jobs.  These jobs appear to be the exact types of jobs that

SSR 83-12 suggests would be especially difficult for someone with a sit/stand option to

perform.  And, the ALJ also found that Plaintiff could only stand for two hours in an

eight-hour day, which makes the VE's finding concerning the cashier jobs even more

suspect.  On remand, the VE must clarify why his testimony differs from the DOT and

must explain, in light of SSR 83-12, how an individual who needs a sit/stand option and

who can only stand for two hours in an eight-hour workday can perform the light

unskilled job of cashier.

**Issue 3:**       **Whether the ALJ's RFC assessment was improper.**

Finally, Plaintiff asserts that the ALJ's RFC assessment was flawed.  The court

14

agrees

and concludes that on remand the ALJ must reexamine Plaintiff's RFC and her

credibility.  The ALJ, in assessing Plaintiff's RFC, must consider whether or not

Plaintiff's condition has worsened as an explanation for inconsistencies in the opinions of

different doctors.  *Clifford v. Apfel,* 227 F.3d 863, 871 (7th Cir. 2000).  The evidence

suggests that the opinion from Dr. Bitza, which preceded Dr. Coram's evaluation by

nearly six months, included a finding that Plaintiff was not using assistive devices.

However, six months later, Dr. Coram noted that Plaintiff generally needed an assistive

device.  Additionally, Dr. Coram made findings of significantly limited range of motion

in Plaintiff's shoulders, hips and knees which were not previously present.  This evidence

suggests that Plaintiff's condition deteriorated, and this explanation should have been

considered.

  In addition to considering deterioration, the ALJ must also address Plaintiff's

explanation for her lack of treatment.  SSR 96-7p states that an ALJ must consider a

claimant's explanation for her failure to pursue medical treatment.  Plaintiff, at her

hearing and during her examination by Dr. Coram, stated that she was unable to pursue

more substantial medical treatment because she lacked the finances or insurance to do so.

The ALJ failed to address this issue, finding that Plaintiff was not credible in part because

she was not seeking more substantial medical treatment.  On remand, the ALJ's RFC

assessment must address the issues of deterioration and Plaintiff's financial situation.

## VII.  Conclusion

The final decision of the Commissioner is, therefore, **REMANDED** to properly

address listing 1.00B2b.  The ALJ must also examine whether Plaintiff's condition

deteriorated and examine Plaintiff's financial situation.  Finally, the ALJ must question

the VE about the jobs available to Plaintiff, why the VE's explanation differs from the

DOT, and how the sit/stand option affects the jobs available to Plaintiff in accordance

with SSR 83-12.


**SO ORDERED** this 30th day of July 2007.


_____

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Electronic copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Eric Joseph Yocum
eric_yocum@msn.com